AO 91 (Rev. 01/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Nebraska

FILED
U.S. DISTRICT COURT
DISTRICT OF NEBRASKA

10 FEB 26 PM 3:43

OFFICE OF THE CLERK

| | |
|---|---|
| United States of America<br>v.<br>**JOSHUA LABOY**<br><br>*Defendant* | )<br>)<br>) Case No. 8:10MJ27<br>)<br>) |

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of __11/20/2009__ in the county of __Douglas__ in the _____ District of __Nebraska__, the defendant violated __21__ U. S. C. § __841__, an offense described as follows:

did knowingly and intentionally possess with intent to distribute 100 kilograms or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code, Section 841(b)(1).

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

DEA Special Agent Matthew Kessler
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/26/10

_____
Judge's signature

City and state: OMAHA, NEBRASKA

THOMAS D. THALKEN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

1. Your affiant, Matthew Kessler, is employed as a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), and has been so employed since March 5, 2006. Prior to employment with DEA, Your affiant was employed as a Deputy U.S. Marshal from February of 2003 through November of 2005. In that capacity your Affiant was assigned to Washington D.C. Superior Court and was responsible for court security, protective details, the transportation of prisoners, and the execution of court ordered writs and warrants. Upon becoming employed with DEA, SA Kessler has successfully completed the DEA seventeen (17) week Basic Agents course, which involves the identification of controlled substances, methods of their importation, transportation, manufacture, distribution, and concealment that are and have been utilized by controlled substance violators. During the employment of SA Kessler, he has been involved in the investigation of controlled substance violations, and has participated in the execution of surveillance operations, undercover operations, and the arrest of subjects related to the aforementioned controlled substance violations. As a result of his training and experience, SA Kessler has become familiar with the methods and techniques utilized by controlled substance violators to import, transport, manufacture, distribute, and conceal controlled substances. In addition, SA Kessler has received training concerning drug money laundering techniques including various methods to legitimize narcotics proceeds. Based on SA Kessler's training and subsequent case experience, SA Kessler has learned that when drug dealers amass large sums of money from the sale of drugs, they attempt to

1

legitimize these proceeds so as to avoid suspicion from law enforcement officials, seizure and forfeiture of such wealth, and to avoid Federal tax liability. SA Kessler has learned such individuals conceal and divert their drug proceeds and facilitate their narcotics business by the use of U.S. and foreign banking facilities, cashier's checks, wire transfers of funds, purchase and use of automobiles, yachts, airplanes, real estate investments, and structuring currency transactions in amounts under $10,000.00 to avoid the filing of Currency Transaction Reports by financial institutions. Your affiant, SA Kessler, is currently investigating money laundering allegations in violation of 18 U.S.C. § 1956 and the related forfeiture statutes 18 U.S.C. § 981 and 18 U.S.C. § 982 which provide for the forfeiture of all property involved in money laundering transactions and any property traceable thereto. Additionally SA Kessler is currently investigating violations of the Controlled Substances Act, 21 U.S.C. § 841 et seq. and its related forfeiture statute, 21 U.S.C. § 853.

2. This affidavit is made in support of an application for a criminal complaint against Joshua LABOY for violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute marijuana. Joshua LABOY is known to use date of birth August 12, 1978.

3. Your Affiant is aware of the following facts and circumstances related to this investigation:

4. On 11-20-2009, Omaha Police Department (PD) responded to a reported burglary in progress at 2013 N. 67th Avenue, Omaha, Nebraska. During the sweep of 2013 N. 67th Avenue, Omaha PD Officers observed an unknown quantity of U.S. currency and narcotics in the first floor southeast bedroom in plain view. The residence was secured

and a state search warrant was sought. On 11-21-2009, the state search warrant was executed at 2013 N. 67th Avenue. 377 pounds of marijuana in black duffle bags and $110,680 U.S. currency in a black bag were seized by Omaha PD. Officers also saw inside the residence four brown airplane seats ("Brown Seats"). Outside the residence were a maroon or purple minivan and a white Pontiac Grand Prix. David C. Herman was arrested at the scene. A sample of the marijuana was later tested at a laboratory, which confirmed it was in fact marijuana.

5. On 11-20-2009 at approximately 10:55 P.M., a post-Miranda interview of David HERMAN was initiated. HERMAN identified "Josh" and "Lee" being at the residence with HERMAN. HERMAN described Josh as a heavy set, white male, approximately 235-240 pounds with facial hair, a thin beard. HERMAN stated Josh was balding and he was approximately 31 to 32 years of age. In an interview on February 9, 2010, HERMAN specifically identified "Josh" as Josh LABOY and "Lee" as Lee WEINSTEIN.

6. During the interview on 11-20-2009, HERMAN ultimately stated Josh gave him $2,500 U.S. currency to rent 2013 N. 67th Avenue. $1,250 was for the first month's rent, $750 was for the deposit, and $500 was for HERMAN to keep. HERMAN stated he thought the house was going to be used for a narcotics operation but did not know to what extent. HERMAN stated Josh lives in Arizona. With regard to the marijuana found at 2013 N. 67th Avenue, HERMAN believed there was supposed to be more marijuana because Josh told HERMAN the shipment wasn't as large as they thought, and they didn't get as much as they wanted. Based on evidence from 2013 N. 67th Avenue, Omaha, Nebraska and

3

other information known to them, investigators did not believe HERMAN was candidly disclosing all information he knew during his 11-20-09 interview.

7. Various documents were seized as a result of the execution of the search warrant at 2013 N. 67th Avenue, Omaha, Nebraska. One of the documents was a self-prepared 2008 – 1040EZ U.S. Individual Income tax return with the name and address of Joshua LaBoy, 24906 W. Boone Dr., Casa Grande, Arizona, 85293. Another referred to the Nebraska City Municipal Airport.

8. One of the documents recovered from 2013 N. 6$^{7th}$ Avenue confirmed the receipt by Dan Howard Aircraft Sales in Tulsa, Oklahoma of a down payment for the purchase of an airplane with tail number N3445L. On 11-23-2009, a Subpoena was served on Dan Howard Aircraft Sales. In response, investigators received documents reflecting the sale of a Cessna 206 airplane, tail number N3445L (the "Cessna 206") from Dan Howard Aircraft Sales to Joshua LABOY.

9. A phone interview was conducted with Dan Howard on 11-24-2009 with regard to the sale of the Cessna 206 to Joshua LABOY. Dan Howard stated he had received a phone call from a male who was later identified as Josh LABOY who stated he was interested in buying an aircraft. On 10-28-2009, Howard showed the Cessna 206 to LABOY and a white male, "Lee" or "Levi Aaron." Howard said the white male Lee LNU was very quiet but Lee LNU and LABOY whispered to each other quite often. LABOY asked for a tape measure, and one was provided. Howard stated LABOY and Lee LNU were taking measurements of the interior of the Cessna 206. Howard stated LABOY signed the

4

contract that night, left a down payment in the form of money orders and left Tulsa the next morning.

10. On 11-27-2009, SA Kessler emailed photos of Lee WEINSTEIN, Joshua LABOY and the Brown Seats to Dan Howard. In an interview on 11-30-09, Dan Howard positively identified the photo of Joshua LABOY as the person he remembered as "Josh," who purchased the Cessna 206. Dan Howard positively identified the photo of Lee WEINSTEIN as the white male "Lee," who accompanied LABOY on 10-28-2009 to look at aircraft. Dan Howard stated the photos of the Brown Seats resembled the seats that were in the Cessna 206 prior to the sale to Josh LABOY.

11. On 11-30-2009, Investigators interviewed Dan Howard Aircraft Sales, Inc., Sales Associate Daniel Fernandez. Fernandez positively identified the photo of Joshua LABOY as the person who he knew as "Josh," and was the same "Josh" who bought the Cessna 206. Fernandez positively identified the photo of Lee WEINSTEIN as the person he knew as "Aaron Levi" and "Lee." Fernandez stated WEINSTEIN was present during the purchase of the Cessna 206 by Josh LABOY.

12. Fernandez stated on 10-28-09 he showed LABOY a few other aircraft that were for sale, in addition to the Cessna 206. Fernandez told LABOY the Cessna 206 was capable of carrying large loads. Fernandez stated LABOY did the majority of the talking. Fernandez stated WEINSTEIN and LABOY engaged in numerous private conferences and whispered a lot. LABOY told Fernandez he was going to start a charter operation. While looking at the Cessna 206, and after one of the private conversations, Fernandez stated LABOY requested if a tape measure was available. A tape measure was provided.

Fernandez stated he observed LABOY and WEINSTEIN taking measurements of the cabin area on the Cessna 206. Fernandez stated on 10-28-2009, LABOY signed the purchase agreement and left approximately $7,100 U.S. currency to $7,300 U.S. currency in money orders as a down payment for the Cessna 206. LABOY called Fernandez the following week and informed Fernandez he needed an additional two to three days to get the money wired to Fernandez. LABOY stated he had to go to Venezuela to get the wire transfer together. LABOY told Fernandez the wire would be coming out of Trinidad.

13. On 12-1-2009, Nebraska State Patrol (NSP) Investigator (Inv.) Brandon Sorgenfrei contacted James Allen at the Nebraska City Municipal Airport in reference to documents that had been seized from 2013 North 67th Avenue, Omaha, Nebraska on 11-21-2009. Allen advised that approximately one month before, Jim Cartoni, a mechanic at the Nebraska City Airport, had received a phone call from Josh LABOY, who stated he was looking for hangar space for a Cessna 206 due to his moving to Nebraska. Allen stated that after the phone call, an unidentified white male had come to the Nebraska City Municipal Airport. Allen described the white male as being 6' to 6'1" tall, approximately 180 to 190 pounds, with short hair, and wearing sunglasses and very nice clothing. Allen was shown a photograph of Lee WEINSTEIN. Allen advised the photograph was of the individual who had come to the Nebraska City Airport.

14. Allen advised that WEINSTEIN had asked to look at a hangar for LABOY in order to determine its size. Allen stated he opened a hangar and allowed WEINSTEIN access to the hangar. Allen advised that WEINSTEIN had asked him if he would be able to park a car in the hanger in addition to the Cessna 206.

6

15. Allen stated LABOY had flown into the Nebraska City Municipal Airport after the hangar presentation to WEINSTEIN. Allen stated he met LABOY at the airport the following day. According to Allen, LABOY stated he was going to be traveling back and forth between Nebraska and Arizona, as LABOY was moving to Nebraska since his girlfriend was attending Creighton University in Omaha. Allen stated LABOY had paid cash for his fuel. Allen stated he went into the office of the Nebraska City Municipal Airport and observed LABOY and other individuals back up a dark-colored minivan bearing Nebraska license plates to the Cessna 206 and begin removing the seats from inside the plane. Allen advised that LABOY had told him he would be removing the seats from the plane in order to have them reupholstered. Allen stated LABOY had indicated he purchased the plane in Tulsa, Oklahoma. Allen advised that after the individuals had removed the seats from the Cessna, they departed in the dark-colored minivan.

16. On 12-16-2009 at approximately 10:30 A.M., Investigators learned from a GPS tracker that a black Ford Expedition, Nebraska plate RBX-585, registered to Ben WEINSTEIN at 5702 Harney Street, Omaha, Nebraska was located at the Plattsmouth Municipal Airport. SA James Wahle conducted a drive through of the Plattsmouth Municipal Airport parking area. SA Wahle observed a black Ford Expedition bearing Nebraska plate RBX-585, and a white Dodge Sport Van, bearing Nebraska plate RJM-429. SA Wahle observed a white male sitting in the driver's seat of the white Dodge van. SA Wahle observed a heavy set Hispanic male, with short black hair standing to the rear of the black Ford Expedition; the rear hatch was open on the black Ford Expedition. SA Wahle engaged the Hispanic male

standing to the rear of the black Ford Expedition in conversation about sky diving. At approximately 1:10 P.M., SA Kessler observed a small blue and white plane come out of the north hangar of the Plattsmouth Municipal Airport, Plattsmouth, Nebraska. At approximately 1:29 P.M., SA Wahle confirmed the plane that SA Kessler witnessed originating from the north hangar was a blue and white aircraft displaying the tail number N3445L. At approximately 1:44 P.M., SA Wahle observed the same Hispanic male he was talking to earlier at the rear of the black Ford Expedition, throw a dark colored soft sided bag into N3445L. Once the Hispanic male threw the bag into the plane, SA Wahle observed the Hispanic male get into N3445L. SA Wahle observed no other persons inside N3445L. At approximately 1:56 P.M., SAs Kessler and Wahle observed N3445L moving in a southerly direction and subsequently go airborne. NSP Inv. Sorgenfrei later presented a photo of Joshua LABOY to SA Wahle. SA Wahle identified the male in the photo as the same male who SA Wahle engaged in conversation about sky diving and the same male SA Wahle observed depart Plattsmouth Municipal Airport in aircraft N3445L.

17. On February 9, 2010, a proffer interview was conducted with David HERMAN at FCI Englewood, Denver, Colorado. HERMAN stated at the time of his arrest, during the execution of the search warrant on November 21, 2009, he had been in the process of taking over dealing in the Omaha, Nebraska, area. HERMAN stated he had been working for Lee WEINSTEIN's Drug Trafficking Organization (DTO), doing banking, renting houses, and other duties for Lee WEINSTEIN.

18. Upon joining the WEINSTEIN DTO, the first thing HERMAN was involved in was the purchase of an aircraft, later identified as a Cessna 206, Tail No. N3445L. HERMAN

was present during conversations when Lee WEINSTEIN stated he was tired of people driving across the country and getting arrested. HERMAN stated he previously met LABOY in a non-drug related situation in Las Vegas, Nevada around 2004.

19. During the planning phase of the Cessna purchase, HERMAN asked about the pilot, at which time either Lee WEINSTEIN or Carlos MARTINEZ had mentioned LABOY would be the pilot. HERMAN stated that Lee WEINSTEIN had arranged to purchase an aircraft in Tulsa, Oklahoma. HERMAN stated he knew the plane was going to cost approximately $100,000 U.S. currency. HERMAN stated he knew the plane would be purchased through an account in Trinidad and Tobago. Lee WEINSTEIN provided HERMAN with approximately $40,000 U.S. currency and instructed HERMAN to transfer the money to Trinidad and Tobago.

20. HERMAN was aware he was going to be transferring half of the money to purchase the plane, and Lee WEINSTEIN was going to transfer the other half. HERMAN stated he wired the money to Trinidad and Tobago, to an account in Carlos MARTINEZ's or Carlos DESMOINEAUX's name. HERMAN stated after the money was transferred to Trinidad, it was then wired to Tulsa, Oklahoma, to purchase the aircraft. HERMAN stated after the wire transaction was completed, he had driven to the Nebraska City, Nebraska, Municipal Airport with Lee WEINSTEIN, at which time HERMAN and WEINSTEIN had looked at airplane hangars and checked out the airport. HERMAN stated while they were at the Nebraska City Municipal Airport they asked about airplane hangars and general airport operating procedures.

21. HERMAN stated approximately two weeks before November 20, 2009, he met LABOY at the Old Chicago restaurant in Omaha, Nebraska. HERMAN knew Lee WEINSTEIN was going to meet HERMAN and LABOY in Arizona once HERMAN and LABOY left Omaha, Nebraska, in the Cessna 206. HERMAN stated he was aware the plane was in Nebraska City, Nebraska. HERMAN stated Lee WEINSTEIN had a friend drive to the Nebraska City Municipal Airport and remove the rear seats from the Cessna 206. HERMAN stated the seats removed from the Cessna 206 by WEINSTEIN's associate were the same seats found by investigators inside 2013 N. 67th Avenue, Omaha, Nebraska, during the Search Warrant on 11-21-2009. HERMAN stated after waiting a couple of days in Omaha, Nebraska, he and LABOY drove to Nebraska City Municipal Airport, where they met Lee WEINSTEIN's younger brother, Ben WEINSTEIN.

22. HERMAN advised that Ben WEINSTEIN provided HERMAN and LABOY with a black duffel bag which HERMAN believed contained approximately $300,000 U.S. currency. HERMAN based the currency amount on the fact he believed Lee WEINSTEIN used approximately $200,000 U.S. currency to purchase the 377 pounds of marijuana seized from 2013 North 67th Avenue, Omaha, Nebraska, and they had approximately $100,000 U.S. currency remaining.

23. HERMAN was provided with a photograph that was seized from HERMAN's cellular phone. The photo displayed a black bag which contained a large sum of U.S. currency. HERMAN confirmed that the photo of the U.S. currency contained in the black bag was the same black bag seized at 2013 North 67th Avenue on 11-21-2009. HERMAN confirmed that the photograph of the plane contained in his cellular phone was the Cessna

206 which Lee WEINSTEIN and LABOY purchased. HERMAN was presented with a photograph depicting the interior of a cockpit and the back of an individual's head. HERMAN stated the individual in the photo was LABOY.

24. HERMAN stated he and LABOY flew the black bag containing cash from Nebraska City Municipal Airport to Ryan Airfield, located outside Tucson, Arizona. HERMAN said that when he and LABOY landed at Ryan Airfield, Lee WEINSTEIN was at the airport waiting for them. HERMAN stated Lee WEINSTEIN drove a 2004 or older white Dodge minivan with a gray interior and the rear seats removed. After they gave Lee WEINSTEIN the bag of U.S. currency, WEINSTEIN departed Ryan Airfield. HERMAN stated it took approximately nine days for Lee WEINSTEIN to get a marijuana load together to fly back to Nebraska.

25. On 11-20-2009, HERMAN stated he and LABOY went to Ryan Airfield, then flew to Nebraska in the Cessna 206. HERMAN stated the Cessna 206 was loaded with large black duffel bags, the same duffel bags seized during the search warrant on November 21, 2009. HERMAN said during the flight from Tucson, Arizona to Nebraska City, Nebraska, he opened the large black duffel bags and observed marijuana inside.

26. HERMAN stated when they landed at the Nebraska City Municipal Airport on November 20, 2009, it was dark, around 8:00 p.m. After arriving HERMAN and LABOY unloaded the marijuana into a purple van. HERMAN stated Lee WEINSTEIN arrived at the airport after the Cessna 206 arrived. After the van was loaded with the marijuana, Lee WEINSTEIN drove the van, while HERMAN and LABOY drove a white Grand Prix.

HERMAN stated they drove from the Nebraska City Municipal Airport directly to 2013 North 67th Avenue without making any stops.

27. HERMAN stated once at 2013 North 67th Avenue, Lee WEINSTEIN instructed LABOY and HERMAN to unload the marijuana from the van and place the marijuana in the house. HERMAN stated he had previously been instructed by Lee WEINSTEIN to rent the house at 2013 North 67th Avenue. HERMAN stated when they arrived at the residence, WEINSTEIN, LABOY, and HERMAN debated whether they should remove the marijuana from the van and place it inside the house based on the fact there were no window coverings. HERMAN stated they decided to take the marijuana out of the van and break it down into smaller quantities.

28. HERMAN stated after getting the marijuana inside the residence, they began breaking it down. HERMAN stated that shortly after getting the marijuana inside the residence, he saw law enforcement officers pulling up to 2013 N. 67th Avenue. HERMAN reported to WEINSTEIN and LABOY that the police were at the residence. HERMAN knew the residence was rented in his name, so he decided to go out and speak to the police officers. HERMAN stated that WEINSTEIN and LABOY ran out the back of the residence and fled the scene. HERMAN stated upon his exiting the residence, he was instructed by officers to get on the ground, and he was placed into custody.

29. Based on the above facts and circumstances, your Affiant believes that sufficient probable cause exists in support of the complaint against Joshua LABOY for violation of 21 U.S.C. § 841(a)(1), possession of a controlled substance with intent to distribute.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 26TH day of February, 2010.

_____
Matthew Kessler, Special Agent
Drug Enforcement Administration

Subscribed to and sworn to before me on February 26, 2010.

_____
THOMAS D. THALKEN
U.S. Magistrate Judge

13